UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                 :

UNITED STATES OF AMERICA         :

                                   :       S1 22 Cr. 233 (KMK)

    - v -                            :

                                   :

ADAM BELARDINO,               :

                                   :

                   Defendant.     :

                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

 

DAMIAN WILLIAMS
United States Attorney for the
    Southern District of New York

JAMES MCMAHON
Assistant United States Attorney

   - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                :

UNITED STATES OF AMERICA       :

                              :      S1 22 Cr. 233 (KMK)

    - v -                          :

                              :

ADAM BELARDINO,          :

              Defendant.     :

                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S SENTENCING MEMORANDUM

     The Government respectfully submits this memorandum in connection with the

sentencing of defendant Adam Belardino, now scheduled for February 9, 2023 at 11:00 AM.  For

the reasons discussed below, the Government respectfully submits a Guidelines sentence would

be appropriate in this case.

I.  The Offense Conduct

     The defendant pleaded guilty to three separate and unrelated offenses.  In the first fraud,

the defendant embezzled more than $300,000 from his mother's formerly close friend, who was

also a client.  In the second fraud, the defendant submitted applications for life insurance policies

on behalf of another client without that client's knowledge or consent in order to receive

commissions for the supposed "sales."  The third offense is a false statement count that arose

from the defendant's false denial to the Internal Revenue Service, the Department of Labor and

the Pension Benefit Guaranty Corporation that his company had failed to transmit his

employees' contributions to their Section 401(k) plan during 2020.

A. <u>Embezzlement from Victim 1 - Count 1</u>[1]

Victim 1, a 64 year old New Rochelle resident, gave her inheritance of approximately $650,000 to the defendant for investment in 2017. These funds were essentially Victim 1's only assets. The defendant invested most of this money into an annuity with Prudential that provided Victim 1 with a monthly income and told Victim 1 he would invest the remainder conservatively. Victim 1 relied on the defendant to choose those investments.

After the defendant formed the Maddox Group ("Maddox"), he convinced Victim 1 to transfer her portfolio there. From October 6, 2020 to August 19, 2021, $313,998 of Victim 1's money was transferred to Maddox in eight separate transactions by check. While Victim 1 generally agreed to transfer her money to Maddox, she believes her signature on at least one of the checks was forged.

Although the defendant told Victim 1 that the money she transferred to Maddox came not from her Prudential annuity but from her other, supposedly more conservative, investments, the reality is that much of the $313,998 came from the annuity. As a result, the monthly income from Victim 1's annuity was reduced.

The defendant gave the defendant one paper statement of her account. During monthly meetings, the defendant would show Victim 1 false balances for her account on his laptop computer. The defendant eventually, and falsely, told Victim 1 her account balance had grown to exceed $900,000.

On September 9, 2021, Victim 1's son told the defendant that Victim 1 had decided to shift her portfolio from Maddox to JPMorgan Chase. The defendant estimated the value of

---

[1] Victim 1 has advised the Government that she wishes to speak at the sentencing pursuant to 18 U.S.C. § 3771(a)(4).

Victim 1's portfolio at Maddox at that time to be approximately $750,000. He said he would transfer Victim 1's assets through an in kind transaction, which would avoid the sale of assets and the resulting tax consequences.

The defendant confirmed the next day that he would transfer the defendant's assets as she requested. He explained to Victim 1's son that it would be easier to sell the defendant's assets and wire the money to JPMorgan. He claimed, inexplicably, that there would be no resulting tax consequences. Victim 1's son asked the defendant for the login information for Victim 1's Prudential account, as he understood that the annuity would not be sold. The defendant never provided this information. When Victim 1's son gained access to the Prudential account a day later, he noticed numerous large withdrawals from the account.

Later on September 10, the defendant emailed Victim 1's son a fabricated wire confirmation showing a wire transfer of $316,279 to a bank account held by "Maddox Escrow." No such account existed at the defendant's bank. The defendant claimed this was one of two wires the fictitious Maddox Escrow account had received, for a total amount of $738,279.69. Later that night, the defendant emailed Victim 1's son another fabricated wire transfer form showing that a wire transfer of $738,279.69 from the Maddox Escrow account to Victim 1's account was scheduled for Monday, September 14.

At 1:40 AM on Monday, September 14, the defendant emailed Victim 1's son two fabricated wire transfer request forms. He falsely claimed that he had emailed these forms to Victim 1's son on Saturday, September 12 and forwarded what he claimed was that September 12 email to the son. The defendant fabricated that September 12 email. Victim 1's son never received the September 12 email. Further, the two documents attached to the supposed September 12 email were both time stamped approximately one hour after the supposed time

3

stamp on the supposed September 12 email.

On September 15, Victim 1 noticed a "deposit hold" of $738,124.69 on her account. This hold occurred after the defendant deposited the first of seven Maddox checks in or near that amount -- none backed by sufficient funds -- into Victim 1's account between September 15 and September 27, 2021. During this period, the defendant kept assuring Victim 1's sons that Victim 1 would get her money.

By September 27, the defendant was running out of options. He emailed Victim 1's sons to say " ████████████████████ and making poor decisions has haunted me. . . . [A]ll I can say, in writing is that I believe this will be closed tomorrow." The defendant promised to provide the funds in a certified bank check the next day. Instead, he provided Victim 1 with yet another bad check drawn on the Maddox account. Over the next few days, the defendant falsely claimed that he was meeting with bank personnel to solve the problems with the bad checks. On October 1, he sent Victim 1's sons a fabricated screenshot of the Maddox bank account showing that Maddox had an available balance of $2,235,190.79. That account was actually overdrawn by $5,895.21 on that day.

The defendant also promised Victim 1's sons on September 30 that his family would repay Victim 1 if he was unable to do so:

> Just to confirm, if money has not cleared your mothers account this morning, Our family will be sending the 739k+ to bring the account current. Our family adores all of you and my mismanagement over the last 2 weeks does not reflect on my mother. Period.

In early October, the defendant started to suggest that Victim 1's money had been invested in alternative investment opportunities with private investment managers. He told Victim 1's son on October 7 that "[t]here are instances that private investments can take 3

4

months to Liquidate such as KKR. That is not the case here." But, on November 12, he emailed

Victim 1's sons that:

> Therefore, KKR, CNL, Fsquare are private companies that liquidate on quarterly basis. I have confirmed they will be complete during this quarter, thank god. I am hoping right after the holiday. I can confirm that the interest incurred during the liquidation period will be added to the gross returned. I hope to have confirmation of these items and the exact dates this week. Before Thanksgiving.

The defendant continued to promise to return Victim 1's money through early February 2022.

On November 28, 2021, Victim 1 was forced to move out of her rent-controlled

apartment in New Rochelle into her daughter's home because she was no longer able to afford

the rent.

Instead of investing Victim 1's funds, as the defendant represented to Victim 1 he would

do, the defendant used Victim 1's money to pay for payroll and office expenses for Maddox;

personal travel; high end restaurants; paying down prior debt; large cash withdrawals; his child's

nursery school; counseling services; and his New York Athletic Club dues. While he was

embezzling Victim 1's funds and covering up that embezzlement, the defendant was living in a

house in Scarsdale and, later, an apartment on Manhattan's ███████████ as well as driving

a Land Rover.

### B. Fraudulent Life Insurance Applications
#### On Behalf of Victim 2 - Count 2

In or about May 2019, the defendant served as the agent for Insurance Company 1 in

connection with an application by Victim 2 for a life insurance policy. The face amount of this

policy grew to $18 million as of April 2020. The defendant received commissions from

Insurance Company 1 for this sale. The Government is not alleging any fraud in connection with

this policy. Instead, this policy is relevant to show the defendant's knowledge that Victim 2 was

fully insured; that he had the opportunity to submit further, fraudulent applications on her behalf because he had access to her personal information; and that the two fraudulent applications he then did submit to other insurance companies on her behalf were not a mistake.

In or about April 2020, the defendant applied for a life insurance policy with a face value of $3 million from Insurance Company 2 for Victim 2 without Victim 2's knowledge or consent. The defendant increased the face amount of this policy to $6 million in August 2020. The defendant made materially false statements regarding Victim 2's income, net worth and health in the application. The defendant paid the policy premiums with Victim 2's money without Victim 2's knowledge or consent.

The defendant received approximately $84,997 in commissions from Insurance Company 2 in connection with this policy.

In or about January 2021, the defendant applied for a life insurance policy with a face value of $5 million from Insurance Company 3 for Victim 2 without Victim 2's knowledge or consent. The defendant increased the face amount of this policy to $12.1 million in May 2021. The defendant made materially false statements regarding Victim 2's income, net worth and health in the application. The defendant paid the policy premiums with Victim 2's money without Victim 2's knowledge or consent.

The defendant received approximately $94,500 in commissions from Insurance Company 3 in connection with this policy.

C. False Denial of Failure to Pay Over Section 401(k)
   Contributions by Maddox Employees - Count 3

Maddox adopted a retirement saving plan pursuant to Section 401(k) of Title 26 of the U.S. Code effective January 1, 2020. The defendant was the trustee of the plan.

Under the plan, employees of Maddox who chose to participate in the plan could elect to have money withheld from their paychecks each pay period in amounts they chose within legal limits. Tax was deferred on the withheld money and profits earned from that money. The defendant was required to deposit the withheld funds into the Plan for investment at the employees' direction in various options offered by the Plan within seven business days.

From November 1, 2020 to August 13, 2021, the defendant withheld $8,004.67 from the paychecks of the four Maddox employees other than himself who were participants in the plan. The defendant did not deposit these funds with the Plan. Instead, he used the money for his and Maddox's purposes.

The defendant then repeatedly misled government agencies about the missed payments. On August 20, 2021, the defendant received a letter from the Department of Labor stating that he had to make the missed payments. He spoke with the Plan administrator that day to arrange for an ACH payment from his JPMorgan Chase account. That account, however, had been closed in December 2020. The defendant knew that, as the bank had sent him several overdraft notices before closing the account. JPMorgan rejected the ACH on August 23.

Despite knowing that he had arranged for an ACH from a defunct account, the defendant told the Department of Labor on August 20 that he had fully paid the contributions. He made the same false representation to the Department of Labor by email on August 25, two days after JPMorgan had rejected his ACH. In that email, he provided the Department of Labor with a screenshot from the Plan website that he claimed was proof he had made the payment.

On August 25, the Plan administrator told the defendant his ACH had bounced. The defendant responded one minute later saying "I believe [the account] is an outdated account," indicating his knowledge all along that the account had been closed.

7

On September 7, 2021, the defendant changed the ACH account at the Plan administrator to his account at City National Bank. The balance in this account had been negative since April 23 and remained negative through at least September. The defendant was well aware of that. He had been involved in telephone conversations with City National personnel about resolving his negative balance in July. He had bounced several checks in July and August, including checks for his office rent. Despite knowing that the City National account had no money in it, the defendant set up yet another ACH payment to the Plan administrator from this account on September 14. His account balance that day was negative $5,439. He was advised that the ACH bounced on September 16.[2]

On October 11, the defendant signed an IRS Form 5500-SF on behalf of Maddox. He falsely answered "no" to the question "[d]uring the plan year, [w]as there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102?" The defendant authorized the Plan administrator to file this return with the Internal Revenue Service, the Department of Labor and the Pension Benefit Guaranty Corporation on October 14.

On that same day, October 14, the Department of Labor emailed the defendant another letter about the unpaid contributions. The defendant responded on November 12, 2021 that Maddox had experienced "negative funds for months" but that paying the Plan administrator and the office rent were his priorities.

---

[2] The seven bad checks the defendant deposited into Victim 1's account from September 15 to September 27, 2021 were from this City National account.

8

II. Calculation of the Offense Level

     The parties have stipulated to the following calculation of the defendant's applicable

Guidelines range of 51 to 63 months in the plea agreement:

     1.  The base offense level is 7.  U.S.S.G. § 2B1.1(a)(1).

     2.  The loss is $621,282.67.[3]  Accordingly, the offense level is increased by 14 levels.
U.S.S.G. § 2B1.1(b)(1)(H).

     3.  The offense resulted in substantial financial hardship to one victim.  Accordingly, the
offense level is increased by 2 levels.  U.S.S.G. § 2B1.1(b)(2)(A)(iii).

     4.  The offense involved sophisticated means and the defendant intentionally engaged in
or caused the conduct constituting sophisticated means.  Accordingly, the offense level is
increased by 2 levels.  U.S.S.G. § 2B1.1(b)(10)(C).

     5.  The defendant abused a position of private trust and used a special skill in a manner
that significantly facilitated the commission and concealment of the offense.  Accordingly, the
offense level is increased by 2 levels.  U.S.S.G. § 3B1.3.

     6.  Assuming the defendant clearly demonstrates acceptance of responsibility, to the
satisfaction of the Government, through his allocution and subsequent conduct prior to the
imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).
Furthermore, assuming the defendant has accepted responsibility as described in the previous
sentence, the Government will move at sentencing for an additional one-level reduction, pursuant
to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter pleas
of guilty, thereby permitting the Government to avoid preparing for trial and permitting the
Court to allocate its resources efficiently.

     In accordance with the above, the applicable Guidelines offense level is 24.  The

defendant is in criminal history category I. The defendant's Guidelines range is 51 to 63 months'

imprisonment.  In addition, after determining the defendant's ability to pay, the Court may

---

[3]  The defendant incorrectly argues that the actual loss is really $501,499.67.  Defendant's Sentencing Memo at 28.
The actual loss figure of $621,282.67 consisted of the money embezzled from Victim 1, the premiums the defendant
paid with Victim 2's money without her knowledge and the withheld Section 401(k) contributions that were not paid
over to the Plan administrator.  The life insurance companies refunded Victim 2's premiums only after the
defendant's offense was discovered, so the fraudulent premiums are included in the actual loss amount.  See
U.S.S.G. § 2B1.1, Application Note 3(E)(i)(money returned to victim after discovery of offense not credited against
loss).  The fraudulent premium amounts are not, however, included in the restitution figure of $501,499.67.  Instead,
the restitution amount includes only the commissions that the defendant received from the fraudulent policies.

impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 24, the applicable fine range is $20,000 to $200,000.

The parties also agreed that "either party may seek a sentence outside of the [51 to 63 month range] based upon the factors" identified in Section 3553(a).

III.  Application of the Relevant Section 3553(a) Factors

An analysis of the relevant Section 3553(a) factors shows that a Guidelines sentence is warranted in this case.

A.  The Nature and Circumstances of the Offense

The aggravating aspects of the nature and circumstances of the defendant's offenses make him more culpable, and more deserving of punishment, than other defendants who have engaged in similar crimes.  The defendant almost simultaneously executed three separate frauds against six different victims.  Each fraud involved systematically repeated deception and extraordinary abuses of his victims' trust.  The defendant's conduct resulted in a significant change in the life of his primary victim.  The defendant did all of this to obtain money with which to continue an opulent lifestyle that was well beyond what he could legitimately afford.  In essence, the nature of the defendant's crimes can be boiled down to an unusual degree of greed and exploitation of others.

1.  Abuse of Trust/Victim Impact

The defendant's abuse of his victims' trust, particularly with respect to Victim 1, is extraordinary.  In addition to being a client, Victim 1 had been for years a close friend of the defendant's mother.  As a result of this relationship, Victim 1 gave the defendant her money to manage and trusted him completely.  She allowed the defendant to decide when and where to

invest her money.  She never questioned the lack of account statements[4] and instead accepted what the defendant told her orally about her portfolio in their periodic meetings.  Victim 1 only discovered the fraud because her sons convinced her to move her money elsewhere.  Had that not happened, the fraud with respect to Victim 1 in all likelihood would have continued for much longer due to the complete and unquestioning trust Victim 1 placed in the defendant.

In a stunning act of betrayal, the defendant stole Victim 1's money and used it to support his failing business and  to live a luxurious lifestyle that was well beyond his means.  The impact of that breach of trust was substantial.  Victim 1 had no other assets or source of income other than Social Security.  She had to give up her apartment and, at age 64, her independence and move in with one of her children.  The defendant knew more about Victim 1's finances than anyone, including Victim 1 herself, because he had falsely led her to believe she had far more in assets than she really had.  As result, he was in a better position than anyone to foresee the impact his thefts would have on Victim 1.

The letters from Victim 1 and her family, which have been submitted to the Court and the defendant under separate cover, describe how that impact goes well beyond a financial loss.  In her own letter, Victim 1 describes how she "lost the life that I loved" through the defendant's thefts and how those thefts turned her into a "pathetic victim" who is now dependent on her children.  Victim 1 now avoids her friends because she is ashamed of her new circumstances and is anxious and depressed.  Her children describe Victim 1 as "broken, shattered and lost" and her grandchildren ask "[w]hy is [Victim 1] so sad all the time?"

---

[4] The defendant gave Victim 1 one written account statement.  He otherwise displayed Victim 1's supposed account balance on his laptop computer during his periodic meetings with Victim 1.

Despite this significant impact his crime had on the life of his old and once close family friend, there is surprisingly little acknowledgment of Victim 1 at all, and little to no mention of the impact of the defendant's acts on Victim 1's life, in the defendant's sentencing memo. The absence of remorse to date from the defendant is unique among white collar criminals awaiting sentencing and is telling, particularly in light of what he has done to an old family friend.

The defendant similarly betrayed the trust of his other victims. Victim 2 gave the defendant access to her bank accounts and her personal information. The defendant abused that trust by twice using her personal information to apply for additional and expensive life insurance policies without her knowledge and using his access to her bank accounts several times to pay the periodic premiums surreptitiously with her money. The defendant also betrayed the trust of his own employees who participated in the Maddox 401(k) plan. Those employees believed that the defendant forwarded the amounts withheld from their paychecks to the plan so that it could be invested to fund their retirements. Instead, the defendant kept the money and lied about it.

2. Repeated Deception

While deception is an element of any fraud, the defendant went to unusual lengths to execute and then cover up his frauds. He engaged in numerous separate acts to execute his embezzlement of Victim 1's funds. He convinced her on multiple occasions to move money to Maddox and, apparently on at least one occasion, forged her signature on a check to obtain money from her. He met with her on approximately a monthly basis for close to a year to review her finances with her while, at the same time, he was stealing her money. He showed her fabricated account balances on his computer during these meetings and, on one occasion, gave her a fabricated paper account statement. When her sons convinced Victim 1 to move her money elsewhere, the defendant embarked on a six month campaign of repeated lies and creation of

12

false documents to cover up what he had done and to convince them that their mother's money was safely invested. He also deposited bad checks drawn on Maddox's account into Victim 1's account on seven different occasions in an effort to create the appearance, even temporarily, that he had returned her money to her.

The defendant's unusual degree of deception continued in his other crimes as well. The defendant lied to the two victim life insurance companies when he submitted the fraudulent applications on behalf of Victim 2 that contained numerous false statements about Victim 2's financial condition and health. He lied to Victim 2 when she asked about transfers of money that were actually premium payments on the additional policies and about documents she received from life insurance companies she had never heard of. Finally, the defendant lied about not paying over his employees' 401(k) contributions.

B. History and Characteristics of the Defendant

The defendant has enjoyed several advantages in his life. His grandfather, a financial planner with more than a half-century of experience, introduced him to the financial planning business, gave him his first job and served as a mentor early in the defendant's career. Aleesia Forni, *A Financial Legacy Lives On*, Westchester County Business Journal, November 10, 2016, at 16, available at www.westfaironline.com/banking-finance/a-financial-legacy-lives-on/. The defendant has benefitted from private schools, a childhood in an affluent town, a college degree and supportive relationships with his ex-wife and girlfriend. Members of his family have written supporting letters to the Court. While the defendant's family life has included tragedy, most of the defendants this Court has sentenced have not enjoyed such advantages.

Despite having such advantages, the defendant's history and characteristics include several aggravating factors that warrant a Guidelines sentence.

13

1. <u>Prior History at Mass Mutual</u>

Prior to founding Maddox, the defendant worked as an account representative at Mass Mutual, a position that evolved from the job his grandfather had arranged for him. Mass Mutual sells life insurance and other insurance products; retirement and 401(k) plan services; annuities; and stock brokerage services. In March 2019, the defendant was fired from Mass Mutual due to customer complaints. The complaints allege conduct that is quite similar to the offense conduct in this case.

For example, the defendant admitted in a March 2019 interview with Mass Mutual counsel in response to a complaint by client M.M. -- a close friend of the defendant's family -- that he had inflated the investment returns in these customers' accounts and provided the customers with fake documents he created to support the inflated returns. Mass Mutual's counsel described the defendant's statements as follows:

> Belardino stated that he did not know why he did it, but stated that when he recently looked at himself and at what he did he did not recognize "the guy in the mirror." Belardino stated he had been going through ███████████████ ███████████ and that all he wanted to do was to please the [client] and he wanted to do so at all costs. . . . Belardino said the last three months of his career has [sic] been awful ███████████████████ . . . Belardino related it ██████ ███████████ as the cause.

With respect to another client complaint that the defendant falsely claimed to have placed a profitable trade but failed to do so at some time in 2018, the defendant claimed not to have remembered the trade or sending a confirming email. He blamed ███████████████████ ███████████ during that period. The defendant initially denied a third client's complaint that he had bought a life insurance policy on the client's behalf after the client said he did not want the policy. He insisted the client had filled out an application for the policy. When confronted with texts between him and the client confirming the client's version of events, the

14

defendant acknowledged there was "some miscommunication" involving the new policy. The defendant did not recall writing the client a check from his personal account, which was returned for insufficient funds, to reimburse him for the policy premium that was withdrawn from the client's bank account. The defendant told Mass Mutual counsel ███████████████████████ ████████████████████ in the three months prior to the March 25, 2019 interview.

Mass Mutual received at least six other client complaints about the defendant in addition to the three complaints described above. The complaints contain multiple allegations that the defendant sold life insurance policies to clients without their knowledge or authorization; made material misrepresentations about the nature of policies, the amounts of premiums that would be due, or the impact of not paying premiums; falsely claimed that premiums withdrawn from the clients' accounts were mistakes; and paying "refunds" of these mistaken withdrawals with funds withdrawn without authorization from the clients' accounts.

Mass Mutual reported the defendant's conduct to the Financial Industry Regulatory Authority ("FINRA"). FINRA requested that the defendant provide a statement responding to the allegations. The defendant responded that he was unable to address the allegations because he did not have access to any of the relevant documents. FINRA then scheduled on the record testimony at which he could review relevant documents. The defendant twice failed to appear for the testimony. FINRA permanently barred the defendant from acting as a registered representative or, more colloquially, a stockbroker, effective October 5, 2021.

## 2. Greed and Continued Opulent Lifestyle

The defendant's financial records show that he spent the money he stole in part on travel, high end restaurants, the New York Athletic Club and unexplained large cash withdrawals. Further, while he was stealing that money and covering up the thefts, the defendant lived in

Scarsdale and, later, on ████████████ He drove, and still drives, a Land Rover. Despite this evidence otherwise, the defendant inexplicably insists his "conduct was not the product of greed or hubris" and was "not the result of malice or greed." Defendant's Sentencing Memorandum at 1, 19.

The defendant's actions after getting caught and pleading guilty only confirm that he is driven by greed. Even as sentencing approached, the defendant has continued to live far beyond his means. As Victim 1's son pointed out in his letter, the defendant has continued to live the high life even after he knew that discovery of his thefts from Victim 1 was inevitable. Since September 9, 2021 – the date that Victim 1's son told the defendant Victim 1 wanted her money transferred out of Maddox – the defendant has posted on social media for everyone to see his trips to St. Barts, Miami Beach and Rocky Mountain National Park. The pictures show the defendant relaxing on the beach, swimming, skiing, visiting the Plaza Hotel at Christmas, eating at Benihana and the New York Athletic Club, attending fashion shows and hiking through a national park. Ex. 1. More importantly for the purposes of sentencing, the pictures confirm that the defendant's crimes were driven by his greed and his apparently insatiable desire to live a more luxurious lifestyle than he could afford through legal means.

The defendant can afford none of this. He reported to the Probation Office monthly expenses of $21,960, which include $7,100 for rent for his apartment on ████████████ $1,000 for groceries; and an $800 monthly car payment, presumably on his 2019 Land Rover. He attempts to offset these expenses by claiming to receive a salary of $8,000 a month, PSR at ¶ 83, presumably from Adastra Financial Solutions, LLC, which company the defendant projected would earn $500,000 annually. PSR at ¶ 80. The defendant presumably told Probation about his Adastra salary and the projection after he entered his guilty pleas in October 2022. He had to

16

know at that time that the salary and projection figures were false.  Adastra was already out of business at that time.  The defendant voluntarily dissolved it in May 2022, five months before he entered his guilty pleas.  Ex. 2.

The defendant is one of the lucky few who has family members who are financially capable, and willing, to lend him hundreds of thousands of dollars so that he can pay partial restitution.[5]  From the point of view of predicting the likelihood of recidivism, it would have been far more encouraging if the defendant had foregone the expensive resorts and restaurants, sold the Land Rover, and moved away from one of the most expensive streets in one of the world's most expensive cities so that he could have paid full restitution or as close to full restitution as possible.

### 3. The Defendant Cannot Blame ▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

The defendant relies heavily ▆▆▆▆▆▆▆▆▆▆▆▆ to mitigate his offenses.  While the Government does not dispute that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ or that the Court may consider those problems under Section 3553(a), those problems are not nearly as significant as the defendant makes them out to be for several reasons.

The defendant has not presented any persuasive evidence of a causal link between ▆▆▆▆ ▆▆▆▆▆▆▆ and his crimes.  His sentencing memo and the letters he submits in support merely assume such a link.  The defendant makes no effort to show that ▆▆▆▆▆▆▆ contributed to his commission of his crimes in a sufficiently material way to support a variance.[6]

---

[5] The defendant has not yet made full restitution to the two life insurance companies.  He has made full restitution to Victim 1 and the four Maddox employees.

[6] There does not appear to be a standard governing when ▆▆▆▆▆▆ can justify a variance.  The Sentencing Guidelines permit a downward departure for ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

In fact, the evidence shows otherwise.  Victim 1, who met with the defendant on a monthly basis for almost a year from October 2020 to August 2021, has said ███████████████ ███████████████████████████████████████████████████████████████ Further, much of the defendant's criminal activity took place ██████████████████ ████████████████████████████████████████████████████████████████ ██████████████████. For example, all of his efforts to cover up his embezzlement of Victim 1's money – the false excuses and promises, the fabricated wire transfer forms and bank statements, the series of bad checks – took place from September 9, 2021 to February 2022.  The defendant knowingly made an ACH payment from a bank account with a negative balance to the 401(k) Plan administrator in September 2021 and lied about the 401(k) contributions in October 2021.

The defendant also engaged in other criminal activity ████████████████████ ████████████████████████████████████ The defendant deposited the first two checks he received from Victim 1 in a total amount of $75,000 in October 2020.  The defendant ████████████████████████████████████████████████████████ ████████████████████████████████ Defendant's Sentencing Memo at 10-11.  He embezzled Victim 1's money within a few days of receiving it by engaging in financial transactions for which he otherwise did not have sufficient funds.  In another example, the defendant deposited three checks from Victim 1 in a total amount of $137,000 from July 13, 2021 to July 22, 2021.  According to his sentencing memo ████████████████████████

──────────

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████.

Defendant's Sentencing Memo at 12-13.  In each of those instances, the defendant stole Victim 1's money within one day by engaging in financial transactions he otherwise could not have afforded.  Further, the defendant made two premium payments on one of Victim 2's fraudulent insurance policies in the summer of 2020, ████████████████████████████████████ ██████████████████████ the defendant continued to withhold his employees' 401(k) contributions.

██████████████████████████ the defendant was able to manage three partially overlapping, complex schemes involving numerous acts of deception and the creation of several false documents.  He did so over an extended period of time and not in a few impulsive, thoughtless acts.

      4.  The Defendant Has Shown No Link Between
          His Crimes and His Family Problems

While his family has experienced tragedy, the defendant has not shown any evidence of a link between that tragedy and his offenses.  Similarly, the defendant has shown no link between his crimes and what he describes as a less than absolutely perfect family dynamic.  ████████ ████████████████ the defendant has experienced a far better family life than many others whom this Court has sentenced.

    C.  Deterrence and the Need for the
       Sentence to Promote Respect for the Law

The defendant's offense were serious for the reasons stated above.  A Guideline sentence is therefore necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

There is an acute need for specific deterrence here.  The defendant has told Probation that

he intends to continue working as a financial advisor and projects that his company could generate $500,000 a year after expenses. While he is unlikely to generate that level of income, the fact remains that the defendant intends to act as a financial planner in the future. That plan is troubling, given that the defendant has entered guilty pleas to the three felonies in this case; has been barred by FINRA; and was fired by his previous employer. The third time around, after the MetLife episodes and the defendant's current crimes, is not likely to be the charm.

The defendant would essentially be unregulated if he goes through with this plan, just as he was when he committed the three crimes at issue here. He would likely continue to have access to client funds and personal information, as he did before. A Guidelines sentence is needed to deter him from further criminal conduct and protect future clients that retain the defendant. For the same reasons, the Government supports Probation's suggestions that the Court impose the third party risk notification and search conditions as conditions of supervised release.

There is also a need for general deterrence here. Anyone can call himself a financial advisor and many so-called financial advisors are unregulated, just as the defendant was. A Guidelines sentence is needed here to deter other financial advisors from fraud and embezzlement.

"The need for general deterrence is particularly acute in the context of white-collar crime." *United States v. Johnson,* 2018 WL 1997975 at *5 (E.D.N.Y. 2018). Courts have recognized that potential white collar criminals are more likely to be deterred because they are more likely to weigh the potential gains from crime against the risk of punishment than other criminals. *See, e.g., United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018)(tax offenders are more likely to analyze potential risks and rewards and "to eschew criminal conduct if it will

20

be unprofitable"), *citing United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008)(en banc)("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence"), *and United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994)("Considerations of deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment to deter it").

### D. Need to Avoid Unwarranted Sentencing Disparities

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *Rita v. United States*, 551 U.S. 338, 349 (2007)(internal quotation omitted). Even after *Booker*, "uniformity remains an important goal of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 107 (2007). The Guidelines "help to avoid excessive sentencing disparities," *id.* (internal quotation omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall v. United States*, 552 U.S. 38, 54 (2007).

21

CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court

sentence the defendant within the applicable Guideline range.

Dated: White Plains, New York
February 2, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

/s

By:     _____
James McMahon
Assistant United States Attorney
(914) 993-1936

cc: Kerry Lawrence, Esq. (by ECF)